UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 11-341 (DWF/FLN)

Lisa Knudson,

        Plaintiff,

v.                        **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

_____

Frank W. Levin, Esq., for Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, for Defendant

_____

Plaintiff Lisa Knudson seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her application for supplemental security income ("SSI").  See 42 U.S.C. § 405(g).  The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g).  The parties submitted cross-motions for summary judgment.  (Doc. Nos. 10, 12). For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

## I.   INTRODUCTION

Plaintiff filed an application for SSI on November 13, 2007.  (Tr. 125-30).  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 78-85).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held on November 20, 2009.  (Tr. 88-90, 29-74).  On December 16, 2009, the ALJ issued a decision denying Plaintiff's claim.  (Tr. 13-28).  The Appeals Council denied Plaintiff's request for review on December 13, 2010 (Tr. 1-5), making the ALJ's decision final for purposes of judicial review.  See 20 C.F.R. § 416.1481.  Plaintiff commenced this action on February 10, 2011, seeking judicial review of the Commissioner's decision.

## II.   STATEMENT OF FACTS

### A.   Background

Plaintiff alleges disability from obsessive compulsive disorder "OCD,"[1] depression and anxiety.   (Tr. 146).  She was 23-years-old when she filed her SSI application.  (Tr. 125).  She completed high school, attending some special education classes.  (Tr. 150, 235-45).  Plaintiff worked as a cashier at Walmart beginning in 2005, and quit on October 1, 2007.  (Tr. 146-47).  She explained in her Disability Report,  "[t]hey weren't letting me do all the things I wanted to do so I decided to quit."  (Tr. 146).  However, in correspondence to the Appeals Council after Plaintiff's disability claim was denied, Plaintiff's representative

---

[1]    The essential features of obsessive compulsive disorder are recurrent obsessions or compulsions that are severe enough to be time consuming (more than 1 hour a day) or cause marked distress or significant impairment.  *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association 4th ed. text revision 2000) ("*DSM-IV-tr*").  Obsessions are intrusive ideas, thoughts, impulses or images that cause marked anxiety or distress.  Compulsions are repetitive behaviors, the goal of which is to prevent or reduce anxiety.  (Id.)

reported Plaintiff quit her job at Walmart because they were going to give her a final written warning regarding her attendance.  (Tr. 231).  Throughout and after high school, Plaintiff quit a number of part-time jobs due to her attendance issues.  (Id.)

The record contains Plaintiff's twelfth grade educational evaluation report from June 2003.  (Tr. 235-45).  At that time, Plaintiff was taking Zoloft for obsessive-compulsive disorder.  (Tr. 236).  Plaintiff missed one out of every six days of school in eighth and ninth grades.  (Tr. 236-37).  At the time of the evaluation, Plaintiff's mother speculated that Plaintiff's academic issues were caused by lack of attendance due to OCD, and because she worked every weekend.  (Tr. 236).  Plaintiff worked at a grocery store, where she bagged groceries and cleaned.  (Tr. 241.)  Reports from Plaintiff's employer indicated Plaintiff was punctual, accurately followed directions, made an effort to do her best, but rarely initiated tasks on her own.  (Id.)

Based on cognitive assessments, Plaintiff's IQ was in the below average range of 75-89, with her score likely being between 80-85.  (Tr. 238).  Her slow processing speed, limited visual perception, and sequencing skills negatively skewed her full scale IQ score into the borderline range.  (Id.)  She read at the seventh grade level, performed math at the sixth grade level, did well on spelling but had difficulty writing simple sentences.  (Tr. 239).  Her greatest deficits were in oral language and expression, possibly indicating low receptive language skills or poor attention.  (Id.)  She qualified for special education in math.  (Tr. 245).  Plaintiff had plans to go to beauty school.  (Tr. 242).

Three years later, Plaintiff was admitted to the Psychiatric Acute Care Hospital Service at Mayo Clinic on April 15, 2005, for obsessive, overwhelming thoughts of wanting to hurt herself.  (Tr. 281).  She had held a knife to her wrist, but said she did not actually

want to hurt herself.  (Id.)  Plaintiff had no previous hospitalizations but was seeing three therapists.  (Id.)  She  was stressed because she was unable to pass a cosmetology license examination.  (Id.)  She was started on Risperdal for possible psychotic disorder. (Id.)

Plaintiff explained that her worsening anxiety and thoughts of hurting herself increased when she was alone or had nothing to do during the day.  (Tr. 290).  Her anxiety also increased when her parents went on vacation for several weeks.  (Id.)  Her mental status examination was normal, although she appeared mildly anxious.  (Tr. 294).  Plaintiff was encouraged to use the cognitive behavioral strategies that she was familiar with, and if this did not help, her medication would be increased.  (Tr. 292).

Plaintiff underwent a psychosocial assessment on April 19, 2005.  (Tr. 286).  She had been diagnosed with obsessive compulsive disorder five years earlier.  (Id.)  She received special education services and went on to complete cosmetology school, despite the fact that she tended to skip school.  (Id.)  She failed the license exam six or seven times.  (Id.)  She lived apart from her parents during cosmetology school, then moved back with them.  (Tr. 287).  She also had a number of part-time jobs over the years at McDonald's, a nursery school, and a grocery store.  (Tr. 286).  She was presently looking for a job.  (Id.)

Although Plaintiff improved with medication changes, she continued to have perseverative thoughts of self harm.  (Tr. 283).  Staff was concerned she was minimizing her symptoms to get discharged.  (Id.)   Because she no longer feared her immediate safety, Plaintiff was discharged on April 21, but she was readmitted the next day.  (Tr. 283, 272-76).  She had used a razor to scratch her wrist that morning.  (Tr. 272).  On mental

4

status examination, Plaintiff was calm but occasionally became rapidly anxious and tearful,

wanting to go home.  (Tr. 274).  She was alert, oriented and cooperative.  (Id.)

After admission, Plaintiff's medications were discontinued and she was started on

Prozac.  (Id.)  On April 25, 2005, Dr. Daniel Rohe summarized the results of Plaintiff's

psychological testing as follows.

> Cognitive testing is of uncertain validity.  Current results
> suggests borderline intellectual functioning with low average
> verbal and mildly impaired nonverbal reasoning abilities.
> Performance across measures of learning, memory,
> attention/concentration, and language are compromised with
> the resulting scores being similar to her overall tested
> intellectual ability score.  Yet, reading achievement appears to
> be in the middle of the average range, and her cognitive test
> scores are markedly below that expected based on academic
> achievement.  Further information would need to be procured
> to better understand her history of "learning disability."  The
> compromised cognitive scores may well be secondary to
> medication effects, cognitive disorganization secondary to
> profound problems with anxiety and/or Axis II personality
> issues.  The hypothesis arises that this individual is presenting
> herself as significantly less competent than is actually the case,
> in order to ensure the support and nurturance from a variety of
> well intentioned others.  MMPI results are within normal limits.
> MCMI-II results are consistent with diagnoses of generalized
> anxiety disorder and histrionic personality disorder.

(Tr. 280).

Plaintiff reported gradual improvement in her symptoms during hospitalization but

continued to perseverate.  (Tr. 274).  Because she was tolerating her medication and

denied suicidal ideation, she was discharged on April 28, 2005.  (Tr. 275).  Her diagnoses

were obsessive-compulsive disorder; rule out psychotic disorder, NOS; borderline cognitive

functioning; dependent traits; and her GAF score[2] increased from 40 to 55 over the course of her hospitalization.  (Id.)   Her discharge medications were Lexapro, Prozac and lorazepam.  (Id.) Her ongoing psychiatric care would include medication management with Samantha Grover and psychotherapy with Lisa Frank.[3]  (Id.)

After going to the Faribault emergency room on May 27, 2005, Plaintiff was referred to Mayo Clinic, where she was evaluated by Dr. Gabrielle Melin.  (Tr. 270).  Plaintiff was significantly anxious and having obsessive, intrusive thoughts about hurting herself with a knife.  (Id.) She was unsuccessful in using distraction and thought blocking.  (Id.)  She had been much worse over the last week or so.  (Id.)  On mental status examination, Plaintiff was very distressed but denied paranoia or hallucinations.  (Tr. 270-71).  Her attention and concentration were intact, and she declined hospitalization.  (Tr. 271).  Dr. Melin declined to prescribe more Ativan, referring Plaintiff to her primary care physician.  (Id.)  She recommended cognitive behavioral therapy and follow up at the Anxiety Disorders Clinic for further evaluation.  (Id.)  Dr. Melin diagnosed obsessive-compulsive disorder and borderline intellectual functioning.  (Id.)

---

[2]   The Global Assessment of Functioning Scale ("GAF") is used to report "the clinician's judgment of the individual's overall level of functioning."  *Hudson ex rel Jones v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") (4th ed. text revision 2000)).  GAF scores of scores of 31-40 indicate some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; scores of 41-50 indicate serious symptoms (e.g. suicidal ideation) or any serious impairment in social, occupational or school functioning; scores of 51-60 indicate moderate symptoms (e.g. flat affect or occasional panic attacks).  *DSM-IV-tr* at 34.

[3]   The record does not contain any treatment notes from these providers.

On June 4, 2005, Plaintiff was admitted to Owatonna Hospital with severe akathisia.[4] (Tr. 247).  She was assessed a GAF score of 41, and was very anxious but immediately calmed when she was given Ativan.  (Id.)  Plaintiff had been unemployed for two years and was living with her parents.  (Tr. 251).  She was referred to the emergency room due to high anxiety, restless legs, and intrusive thoughts of hurting herself with various things including knives.  (Id.)  Her parents were afraid to leave her alone the past several months, because she had obsessive thoughts about self-destruction.  (Id.)  She also had a strong family history of depression and anxiety.  (Tr. 252).  Her mental status examination was normal with the exception of slow thought process and probably below average intelligence. (Id.)  Psychiatrist Joseph Wilson noted Plaintiff had developmental delays.  (Tr. 253).  He also noted Plaintiff had some social problems that could easily be explained by her anxiety, and she did not appear to have a social phobia.  (Id.)  Dr. Wilson continued Plaintiff on Abilify and Vistaril, reduced her Prozac, and started a limited duration of treatment with Ativan.  (Tr. 253).

Plaintiff's obsessive thoughts of harming herself were relieved with Ativan, and the only side effect was mild sedation.  (Tr. 247).  Plaintiff felt much better upon discharge two days later, and was assessed a GAF score of 50 by Dr. Wilson.  (Tr. 247-48).  Dr. Wilson stated, "I hope that we can encourage Lisa to obtain employment and become independent.  It would appear that her anxiety disorder, in combination with her limited intellectual abilities, may prove to be partially or completely disabling from holding steady

---

[4]   Akathisia is a syndrome characterized by an inability to remain in a sitting posture, with motor restlessness and a feeling of muscular quivering.  *Stedman's Medical Dictionary* 40 (27th ed. 2005).  It may appear as a side effect of antipsychotic medication.  Id.

employment in the national economy." (Tr. 248).  Plaintiff's principal diagnosis was obsessive-compulsive disorder. (Tr. 249).

Plaintiff underwent a psychological consultation with Dr. Jonathon Abramowitz at Mayo Clinic on June 8, 2005. (Tr. 266-69).  Plaintiff scored in the severe range on the Yale-Brown Obsessive-Compulsive Scale.  (Tr. 266).  She had intrusive, unwanted thoughts about suicide but was adamant that she did not want to commit suicide. (Id.)  She had difficulty explaining why she touched herself with sharp objects from time to time.  (Tr. 266-67).  Plaintiff sometimes described her intrusive thoughts as hearing voices, and it was not easy to determine if she actually had psychotic symptoms, but she was at the age when psychotic symptoms would develop.  (Tr. 267).  Plaintiff was sleeping with her mother out of fear of being alone in her room.  (Id.)   Plaintiff's mother reported she had to encourage Plaintiff to brush her teeth and get dressed, which was a new symptom.  (Id.)

On examination, Plaintiff was obese and fairly well groomed.  (Id.)  She was appropriate but immature.  (Id.)  She rocked back and forth crying.  (Id.)  Plaintiff was generally cooperative but Dr. Abramowitz had serious concerns about the validity of her responses because they were at times contradictory.  (Id.)  Dr. Abramowitz diagnosed probable OCD, histrionic and dependent personality traits, history of learning disability, and to rule out psychotic symptoms.  (Tr. 268).  He recommended residential OCD treatment or outpatient treatment as an alternative, noting Plaintiff might have difficulty with understanding the rationale for cognitive behavioral therapy and following through with treatment.  (Id.)

The next treatment record is more than a year later, November 21, 2006, when Plaintiff had her first meeting with a case manager from Rice County Social Services.  (Tr.

302, 309-10).  She wanted to live in her own apartment, keep her job at Walmart, and apply for SSI.  (Tr. 310).  She had her driver's permit and wanted to get her license.  (Id.)  Plaintiff completed a social security application with help from her case worker on December 1, 2006.  (Tr. 309).

On January 25, 2007, Plaintiff requested a meeting with her case manager to talk about social security and going to school.  (Tr. 308).  The next month, Plaintiff asked her case manager to speak to her employer about giving her different responsibilities.  (Tr. 306.)  Plaintiff was encouraged to do this on her own.  (Id.)  Plaintiff also expressed her desire to go back to school, but she might have financial aide issues.  (Id.)  She was interested in becoming a CNA.  (Tr. 307).

In June 2007, Plaintiff was working as a cashier at Walmart.  (Tr. 299).  She told Dr. Wilson she felt "pretty good" and liked her job.  (Id.)  Dr. Wilson noted her great progress and continued her medications, Prozac, Seroquel and Ativan, without change.  (Id.)  His diagnosis was OCD.  (Id.)  Dr. Wilson only partially completed the "mental status examination" section of his progress note, indicating that Plaintiff was alert and fully oriented.  (Id.)

On September 21, 2007, Dr. Wilson noted Plaintiff quit her job and said it was not due to her mental stability but attendance issues.  (Tr. 298).  Dr. Wilson described Plaintiff as stable with "a lot less obsessive thoughts."  (Id.)  He noted she would work with a counselor to obtain employment.  (Id.)  On Plaintiff's mental status examination, she was alert and fully oriented, well-groomed, cooperative, calm, with appropriate affect, euthymic

mood and normal thoughts.  (Id.)  Dr. Wilson's diagnosis was OCD and to rule out schizoaffective disorder.[5]  (Id.)

Plaintiff began vocational rehabilitation services with the Minnesota Department of Employment and Economic Development in October 2007.  (Tr. 368-370).  In an October 19 meeting with her rehabilitation counselor, Dave Cook, Plaintiff said she quit working at Walmart because they would not move her out of the cashier position, but Plaintiff's father said the employer had enough of her calling in sick.  (Tr. 369).  Plaintiff told Cook she still had OCD but it was less of a problem.  (Id.)  She wanted to return to cashiering in a different retail setting.  (Id.)

On November 20, 2007, Cook stated, "[Plaintiff] has applied for Social Security and is not eager to mess up her application by working thereby disproving her application for SSA.  She does believe that she will be able to do cashier work in the future but does have some left over fear and negative feeling after her Walmart experiences."  (Tr. 367-68). Plaintiff would not be looking for a job while she waited for a decision from the SSA.  (Tr. 368).

Plaintiff underwent a psychological consultative examination with Dr. William Scurry on December 11, 2007.  (Tr. 315-19).  Plaintiff reported she had OCD her whole life, but

---

[5]    The essential feature of schizoaffective disorder is an uninterrupted period of illness, during which, at some time, there is a major depressive, manic or mixed episode concurrent with symptoms that meet Criterion A for schizophrenia.  *DSM-IV-tr* at 319. During the same period, there must be delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms.  Id.  The mood symptoms must be present for a substantial portion of the duration of the illness.  Id.  Criterion A of schizophrenia is a mixture of characteristic signs or symptoms that are present for a significant portion of time during a one month period.  *DSM-IV-tr* at 298.

she managed her thoughts much better since starting Prozac.  (Tr. 316).  Her bad days were fairly rare, but she struggled with her condition on a daily basis.  (Id.)  Plaintiff lived with her parents and older sister, and her daily activities included housekeeping, phoning friends, shopping or visiting one of her sisters.  (Id.)  Her father provided her transportation. (Id.)  She prepared her own lunch and could shop for her own basic needs, but needed a ride.  (Id.)  She sometimes ate dinner out with a friend, and after dinner watched tv, read, did crafts or talked on the phone.  (Tr. 316-17).  On the weekends, she stayed home and played games with her family, visited her sister or went to the mall.  (Tr. 317).  She went to church with her family and was looking into volunteering there.  (Id.)  When she had an income, she was able to manage it without assistance.  (Id.)  Her mood was "probably a lot better" compared to the time when she was severely depressed.  (Id.)   Dr. Scurry estimated her intelligence to be average or low average.  (Tr. 318).

Dr. Scurry opined Plaintiff had the mental capacity to understand, remember and execute basic repetitive functions.  (Tr. 319).   She could execute tasks with acceptable persistence or pace and maintain concentration and attention.  (Id.)  She could relate effectively to coworkers and supervisors and adapt to the stress of entry level work.  (Id.) Dr. Scurry diagnosed obsessive-compulsive disorder by history; depressive disorder, NOS; anxiety disorder, NOS; and assessed a GAF score of 55.  (Id.)

Dr. Ray Conroe completed a Psychiatric Review Technique Form regarding Plaintiff on December 31, 2007.  (Tr. 320).  He opined that she had affective, anxiety and personality disorders that caused no restrictions in activities of daily living or social functioning, and moderate difficulties in maintaining concentration, persistence or pace, and

no episodes of decompensation.  (Tr. 330).  Dr. Conroe also completed a Mental Residual

Functional Capacity form.  (Tr. 334-37).  It was Dr. Conroe's opinion that Plaintiff:  1)

retained sufficient mental capacity to concentrate on, understand, remember and carry out

routine, repetitive instructions and tasks; 2) could handle brief, infrequent and superficial

contact with coworkers and the general public; 3) would not be significantly limited in

handling supervision; and 4) could tolerate and respond appropriately to stress in a routine,

repetitive work setting.  (Tr. 336).  Dr. James Alsdurf affirmed Dr. Conroe's opinion on

March 13, 2008.  (Tr. 355-57).  Dr. Alsdurf gave his opinion of Plaintiff's RFC, and it was

the same as Dr. Conroe's opinion with the exception that Dr. Alsdurf did not limit Plaintiff's

contact with coworkers and the general public to "infrequent."  (Tr. 360).

       Dr. Wilson next saw Plaintiff on January 7, 2008.  (Tr. 340).  Plaintiff reported she

was denied Social Security benefits a second time. (Id.)  On examination, Plaintiff was alert

and fully oriented, well groomed, cooperative, calm, with a broad range and appropriate

affect, anxious mood, and normal thoughts.  (Id.)  Dr. Wilson's diagnosis was

schizoaffective disorder with an OCD component. (Id.)  Dr. Wilson stated, "I don't see how

she can maintain employment because of schizoaffective D complicating multiple  learning

disabilities (or borderline intellectual function).  Stress of more than part time work in a

sheltered setting is likely to result in decompensation."  (Id.)

       On February 8, 2008, Dr. Wilson completed a form entitled "Medical Opinion Re

Ability To Do Work Activities (Mental)."  (Tr. 350-51).  He indicated, by checking the

appropriate box on the form, that Plaintiff had poor or no ability to do the following activities:

maintain attention for a two-hour segment; understand, remember and carry out detailed

instructions; set realistic goals or make plans independent of others; sustain an ordinary routine without special supervision; complete a normal workday or workweek without interruptions from psychologically based symptoms; perform at a competitive rate; travel in an unfamiliar place; respond appropriately to changes in a routine work setting; and deal with normal work stress.  (Id.)  He also opined she would have only a fair ability to do the following:  understand, remember and carry out very short and simple instructions; maintain regular attendance and be punctual; make simple work-related decisions; interact appropriately with the general public; behave in an emotionally stable manner; adhere to basic standards of neatness and cleanliness; get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions.  (Id.)  He estimated Plaintiff would be absent from work more than three days a month.  (Tr. 351).  Dr. Wilson asserted these limitations were caused by Plaintiff's low stress tolerance, unstable mood and nervous preoccupation.  (Tr. 351).

Mary Mensing took over as Plaintiff's Rehabilitation Counselor in January 2008.  (Tr. 366-67).  The next month, Plaintiff expressed a strong interest in child care.  (Tr. 366).  Plaintiff said she had good organizational skills and got along well with most people.  (Id.)  She said her hobbies included reading, computer games, movies, shopping, and getting together with friends.  (Id.)  Her goal was to live on her own.  (Id.)  In March 2008, Plaintiff was offered a part-time job in the cosmetics' department at Walgreens as a beauty consultant.  (Tr. 365).

On May 23, 2008, Mensing spoke with Plaintiff's supervisor at Walgreens.  (Tr. 364).

Plaintiff was well liked and great with customers but her cash register was short every night,

probably because she was pushing a coupon button twice when stressed.  (Id.)  About six

weeks later, Mensing observed Plaintiff cashiering at Walgreens.  (Tr. 363).  Her customer

service was friendly and fast but her cash register was short.  (Id.)  The employer liked

Plaintiff and offered her a position at a slower cash register.  (Id.)  After creating a scene

by crying and stomping her feet, Plaintiff accepted the change with help from her counselor.

(Id.)  As of July 1, 2008, Plaintiff was employed at Walgreens for ninety days, and Plaintiff

and her employer were satisfied with her employment.  (Tr. 361-62).

Dr. Wilson saw Plaintiff on July 7, 2008, and noted Plaintiff was doing well despite

the stress of work and a move.  (Tr. 389).  Plaintiff recently moved into an apartment and

was thinking of doing more babysitting.  (Id.)  She reported needing to use more Ativan for

anxiety, but she said her thoughts of harming herself were gone.  (Id.)  On mental status

examination, Plaintiff was alert and fully oriented, well groomed, cooperative, calm, with

euthymic mood and normal thoughts.  (Id.)  Dr. Wilson's diagnosis was schizoaffective

disorder.  (Id.)   Plaintiff's mental status was normal again in November 2008, but she

reported still getting anxious.  (Tr. 390).  Her medications were Prozac, Seroquel and

Ativan, and Dr. Wilson did not make any changes.  (Id.)

Plaintiff's representative in the Social Security administrative process, Kelly Blad,

reported to the Appeals Council that Plaintiff only maintained her job at Walgreens for

ninety days because she was too slow and made mistakes.  (Tr. 229).  According to Blad,

Plaintiff lost every job she had due to the same pattern, when criticized about her performance, she worked even slower and stopped going to work.  (Tr. 229).

On December 1, 2008, Plaintiff told Dr. Wilson she did not work at Cub any more because her manager was verbally abusive.  (Tr. 395).[6]  She planned on volunteering at a hospital and said she wanted to work with kids.  (Id.)  Dr. Wilson quoted Plaintiff that she was "taking a break for a while, I'm on welfare and food stamps until I get a job."  (Id.)  Plaintiff also said, "sometimes I do get depression but I cope with it."  (Id.)  She did not think her medications needed to be changed, but she also reported she was taking more Ativan than before.  (Id.)  On mental status examination, Plaintiff's mood was euthymic, and her thoughts were normal.  (Id.)  Dr. Wilson stated, "I hope that she can connect with her Case Mgr and get more guidance.  It has proven to be very difficult for Lisa to maintain gainful employment in the national economy - she may need to apply for Social Security."  (Id.)

On March 4, 2009, Plaintiff told Dr. Wilson that she had more anxiety if she missed taking her Seroquel, but it was knocking her out.  (Tr. 394).  She was not having self-destructive urges.  (Id.)  Dr. Wilson decreased her Seroquel but started Abilify.  (Id.)  Plaintiff's mental status examination was normal.  (Id.)  The next month, Dr. Wilson noted Plaintiff was volunteering at Northfield Hospital.  (Tr. 393).  Her mental status examination was again normal.  (Id.)  Dr. Wilson discontinued Plaintiff's Abilify because it caused restless legs.  (Id.)  He increased her Seroquel a few days later.  (Id.)  On July 9, 2009, Plaintiff told Dr. Wilson she was "doing a lot lately," and she had some episodes of

---

[6]     Plaintiff's "Work Background" form indicates she worked at Cub Foods from March 2009 through June 2009, for twenty hours per week.  It does not indicate an earlier period of employment at Cub.

depression "where it was hard." (Tr. 392). She lived in her own apartment and was looking for a job, volunteering, and helping her dad with a paper route. (Id.) On mental status examination, she was alert and fully oriented, well groomed, cooperative, calm, with broad range and appropriate affect, euthymic mood and normal thoughts. (Id.) Dr. Wilson felt she was doing well on a moderate dose of Seroquel. (Id.)

Dr. Wilson noted Plaintiff was earnestly looking for work in October 2009. (Tr. 391). Her social security hearing was the next week. (Id.) Plaintiff's affect was constricted but her mental status examination was otherwise normal. (Id.) Dr. Wilson stated, "I'm sure that Lisa isn't able to maintain gainful employment in the national economy." (Id.) Dr. Wilson reduced Plaintiff's dose of Ativan, which she took as needed for anxiety. (Id.)

### B. Administrative Hearing

Plaintiff testified at an administrative hearing before ALJ Roger Thomas on November 20, 2009. (Tr. 29). Plaintiff received special education in math and English, and graduated high school. (Tr. 37-38). She also graduated from beauty school but failed the license examination seven times. (Id.) Plaintiff had a job at Walgreens for ninety days but it ended because she was not fast enough as a cashier, and she was absent too often. (Tr. 39-40). She explained that her absences were either from being sick or staying home because she was worried about not understanding how to do the job. (Tr. 40).

Plaintiff also worked part-time at Walmart for two years as a cashier. (Tr. 41). After about a year, she had to take two or three months off due to depression and OCD but returned for another year. (Tr. 41-42). The second year was harder than the first because they expected her to work faster. (Tr. 42). She also worked part-time in a grocery store

16

as a bagger for a year.  (Tr. 42-43).  She felt like she needed to do something else, so she quit.  (Tr. 43).  The ALJ asked whether she quit because it was boring, but she said it was because the managers felt that she took too long to learn things.  (Tr. 44-45).  Plaintiff also had a nursery attendant job at her church, but it was only once a week.  (Tr. 44).  She enjoyed it very much and had been babysitting since she was 12 or 13-years old.  (Id.)  She also worked part-time at McDonald's for several months.  (Tr. 67-68).

Plaintiff lived alone for the year before the hearing.  (Tr. 35).  She did her own housework and rode her bike or got a ride to the grocery store.  (Id.)  Her mother was teaching her how to cook.  (Tr. 49).  She cared for her two cats.  (Tr. 47).  Plaintiff stayed at her parents' home on the weekends, and they visited her once a week.  (Tr. 35-36).  Her parents paid her rent.  (Tr. 36).  She watched television two hours a day and read classic novels.  (Tr. 47-48).  Plaintiff did a weekend paper route, and her father drove because she did not have a driver's license.  (Tr. 37).  She shopped, went out to dinner, and watched movies with friends. (Tr.  50-51).

Plaintiff was on medications prescribed by Dr. Wilson.  (Tr. 46).  The medications helped, but not enough for her to work full-time because she still got anxious and depressed.  (Tr. 46).  She had panic attacks a couple times a week, caused by stress.  (Tr. 49).  Her OCD symptom was rushing thoughts in her head.  (Tr. 50).  When she was working, rushing thoughts interfered with her ability to help customers.  (Id.)  Sometimes she could handle stress, other times she suffered anxiety.  (Id.)

Plaintiff's mother, Wendy Knudson, also testified at the hearing.  (Tr. 51).  Plaintiff was in special education her whole life, starting before kindergarten.  (Tr. 52). At the time of the hearing, Plaintiff worked hard at living independently, riding a bicycle to the grocery

store to shop for herself.  (Tr. 53).  She did not have her driver's license because she was taking Ativan, an anti anxiety medication that dulled the senses.  (Tr. 54).  Mrs. Knudson explained that Plaintiff had trouble with attendance her whole life.  (Tr. 55).  She always tried to push Plaintiff to go to school or work but felt Plaintiff could never understand the consequences of poor attendance.  (Id.)  Plaintiff once worked in a bakery and had difficulty with one of the managers.  (Tr. 56).  Her mother felt the manager did not understand Plaintiff was slower due to her learning disability, and Plaintiff was very sensitive to criticism.  (Id.)  Plaintiff's job bagging groceries was through a school work program, and she was reprimanded for not bagging the right things together.  (Tr. 58).  She also had difficulty because she was sensitive and customers were sometimes rude.  (Id.)

Mrs. Knudson also explained that she felt Plaintiff was pushed through beauty school without actually learning the skills adequately.  (Tr. 60-62).  She felt people believed Plaintiff understood more than she actually did.  (Tr. 62).  Mrs. Knudson credited Dr. Wilson for helping Plaintiff function by prescribing anti anxiety medication because other medications had not worked.  (Tr. 63-65).  Mrs. Knudson said Plaintiff's biggest obstacle to maintaining employment, other than learning disability, was her absenteeism.  (Tr. 65).  Plaintiff was very tenacious about finding and getting a job.  (Id.)  The problem was that when she was criticized, she would become nervous, start having obsessive thoughts, and skip work.  (Id.)

Frank Samlaska testified as a vocational expert at the hearing.  (Tr. 66).  The ALJ asked a hypothetical question about employment that could be performed by a person of Plaintiff's age, education, work history, and the following impairments: obsessive compulsive disorder, histrionic and dependent personality traits, borderline intellectual

functioning, depression and anxiety, right eye nephritis, reflux and ovarian cyst syndrome. (Tr. 68-69). The ALJ also limited the hypothetical person to routine, repetitive tasks and instructions with no more than brief, superficial contacts with others. (Tr. 69). Samlaska testified the person could perform Plaintiff's past relevant work as a bagger. (Id.) The ALJ posed a second hypothetical question that further restricted work to simple, tangible tasks. (Id.) Samlaska testified such a person could not perform Plaintiff's past relevant work but could perform hand packaging jobs, of which there were more than 11,000 in the State of Minnesota. (Tr. 70). The person could also perform sorting jobs, of which there were approximately 250 jobs in Minnesota. (Id.) For a third hypothetical question, the ALJ added the limitation of low stress work with no high production goals. (Id.) Samlaska testified that limitation would eliminate both jobs he had identified. (Id.) However, the person could perform some housekeeping jobs, of which there were 16,730 jobs in Minnesota, and laundry sorter jobs, of which there were 7,670 jobs in Minnesota. (Tr. 70-71).

## C.   ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since November 13, 2007, the application date (20 CFR 416.971 *et seq.*). . . .

2.   The claimant has the following severe impairments: obsessive compulsive disorder, by history versus schizoaffective disorder; histrionic and dependent personality traits; anxiety disorder NOS; and borderline intellectual functioning (20 CFR 416.920(c)). . . .

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). . . .

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: routine, repetitive instructions and tasks, and brief and superficial contacts. . . .

5.    After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. . . .

6.    The claimant is capable of performing past relevant work as a bagger.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965). . . .

7.    The claimant has not been under a disability, as defined in the Social Security Act, since November 13, 2007, the date the application was filed (20 CFR 416.920(f)).

(Tr. 18-24).

## III.   CONCLUSIONS OF LAW

### A.    Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months." 20 C.F.R. § 416.905(a).  In making a disability determination, the ALJ must follow a sequential evaluation process which applies to both physical and mental disorders.  20 C.F.R. § 416.920 outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled.  At the first step, the ALJ must consider the claimant's work activity.  (Id.)  At the second step, the ALJ must consider the medical severity of the claimant's impairments.  (Id.)  At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or medically equal one of the listings in Appendix 1 to Subpart P of the regulations.  (Id.)  If the claimant's impairment does not meet or equal one of the listings in Appendix 1, at step four, the ALJ must make an assessment of the claimant's residual functional capacity ("RFC") and the claimant's ability to perform her past relevant work.  (Id.)  If the claimant can perform her past relevant work, the ALJ will find that she is not disabled.  (Id.)  If the claimant cannot perform her past relevant work, the "burden of proof shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy." Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. 405(g); Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).  In determining whether evidence is substantial, the court must consider both evidence that

21

supports and evidence that detracts from the Commissioner's decision.  Moore ex rel Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision.  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).

**B.    Issues**

Plaintiff contends the ALJ erred by not contacting Dr. Wilson to resolve inconsistencies with his opinions and failed to fully and fairly develop the record.  Plaintiff also contends if the treating source's opinions had been given appropriate weight, the ALJ would have found her disabled.

**1.    The ALJ Was Not Required to Further Develop the Record.**

Plaintiff asserts a number of errors in the ALJ's analysis of Dr. Wilson's opinions. First, Plaintiff notes the ALJ considered Dr. Wilson's opinion contained in Exhibit 10F [Tr. 340] but the ALJ did not address Dr. Wilson's opinion contained in Exhibit 18F [Tr. 391], an opinion Dr. Wilson provided less than one month before the administrative hearing.  Dr. Wilson also completed a mental residual functional capacity form contained in Exhibit 12F [Tr. 350-51], and Plaintiff contends the ALJ did not state which of Dr. Wilson's opinions he found to be inconsistent with Dr. Wilson's treatment records.  Plaintiff asserts the ALJ must resolve these inconsistencies by contacting Dr. Wilson.

Defendant argued that the ALJ was not required to contact Dr. Wilson merely because his objective clinical findings were not severe enough to support his disability opinion.  Defendant contends there were many records reflecting Dr. Wilson's evaluation of Plaintiff's mental status throughout the record and further development was

unnecessary.  Defendant also asserts the ALJ's failure to specifically cite to Exhibit 18F did not mean the ALJ failed to consider it.

In the ALJ's decision, he discussed a number of Dr. Wilson's records and also noted to "See exhibit 18F."  Exhibit 18F contains Dr. Wilson's progress note of December 1, 2008, where he stated "it has proven to be very difficult for Lisa to maintain gainful employment in the national economy - she may need to apply for Social Security."  The ALJ did not quote Dr. Wilson, but it is reasonable to conclude the ALJ considered this evidence. Nevertheless, a treating physician's opinion that a claimant cannot work is an issue reserved to the Commissioner and is not the type of opinion that the ALJ must consider. See Vandenboom, 421 F.3d at 750 (citing Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  The ALJ should evaluate the treating physician's opinion of the nature and severity of the claimant's impairments.  Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (citing 20 C.F.R. § 416.927(a)(2)).

In discounting Dr. Wilson's RFC opinion, the ALJ cited to Dr. Wilson's opinions contained in Exhibits 10F and 12F.  In Exhibit 10F, Dr. Wilson opined "I don't see how she can maintain employment because of schizoaffective D complicating multiple learning disabilities (or borderline intellectual function).  Stress of more than part time work in a sheltered setting is likely to result in decompensation."  (Id.)  In Exhibit 12F, Dr. Wilson completed a form indicating Plaintiff had poor or no ability to do a number of mental work-related activities and only a fair ability to do other mental work-related abilities.  (Tr. 350-51).  The Court finds no inconsistencies between any of Dr. Wilson's opinions that require his explanation.

It is true that the ALJ has the responsibility to fully and fairly develop the record, because the Commissioner shares the goal that disabled claimants receive benefits. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citing Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994). Plaintiff's contention is that the ALJ should have contacted Dr. Wilson either for clarification of his disability opinions or to give his opinion on which of the hypothetical questions posed to the ALJ most accurately described Plaintiff. First, the ALJ is only required "to seek additional clarifying statements from a treating physician [when] a crucial issue is undeveloped." Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); see also 20 C.F.R. § 416.912(e)(1) (treating physician should be contacted when records are inadequate to make disability determination, such as when there is a conflict or ambiguity that must be resolved.)

Dr. Wilson diagnosed Plaintiff and was treating her for OCD, and later for schizoaffective disorder. He completed progress notes for each visit with Plaintiff every three or four months, beginning shortly before she filed her SSI application in November 2007. He performed mental status examinations and made notes on her progress, changes of medication, and significant events in her life. The Court does not find that any crucial issues were undeveloped.

Second, even if the ALJ had relied on the VE's response to the second or third hypothetical questions and Plaintiff could not perform her past relevant work, the VE testified, under the fifth step of the disability evaluation, that there is other work existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 69-71). Thus, the ALJ did not err by failing to contact Dr. Wilson for his opinion on which hypothetical

24

question most accurately described Plaintiff.  The record is sufficient for the Court to determine whether substantial evidence supports the ALJ's decision to grant little or no weight to Dr. Wilson's opinion and whether substantial evidence supports the ALJ's RFC determination.

### 2.    The ALJ's Evaluation of the Medical Opinions Is Supported by Substantial Evidence in the Record.

Plaintiff contends the ALJ's RFC determination must be supported by some medical evidence, and the ALJ's reliance on opinions of nontreating state agency doctors and psychologists is insufficient to constitute substantial evidence on the record.  Defendant responded that the ALJ was entitled to give more weight to Dr. Scurry's consultative examination report because his examination findings were more consistent with his conclusions than Dr. Wilson's treatment records were with his conclusions.  And, Defendant argues the ALJ reasonably gave some weight to the opinions of Drs. Conroe and Alsdurf because the Social Security regulations recognize that state agency psychologists are highly qualified and expert at making social security disability evaluations.  Defendant asserts the ALJ also reasonably considered Plaintiff's daily activities and work history in arriving at the RFC.  Finally, Defendant contends the ALJ properly relied on the VE's testimony that Plaintiff could perform her past relevant work as a bagger, because the hypothetical question to the VE accurately reflected Plaintiff's RFC.  Defendant notes that even if the ALJ reached step five of the disability evaluation and relied on the VE's response to his second or third hypothetical questions, the VE identified thousands of jobs Plaintiff could perform based on those restrictions.

In weighing the medical opinions, the ALJ stated he did not place controlling weight on Dr. Wilson's opinion of disability because it was inconsistent with his treatment notes. (Tr. 23).   The ALJ cited the following evidence: 1) Dr. Wilson did not have to make significant changes to Plaintiff's medication or frequency of treatment sessions; 2) although Dr. Wilson noted unstable moods as a reason for his opinion, the record showed Plaintiff had a stable mood and affect; and 3) Dr. Wilson cited Plaintiff's low stress tolerance and nervous preoccupation, but these symptoms were addressed by restricting Plaintiff to routine, repetitive instructions and tasks and brief and superficial contacts.  (Id.)

The ALJ also cited evidence from the overall record that he found inconsistent with Dr. Wilson's opinion of disability.  (Id.)  Plaintiff was able to graduate high school, work at Walmart for two years, enjoy volunteer activities and live independently.  (Id.)   The ALJ stated, "[h]er history of work activity is not fully consistent with mental incapacity for work but for other reasons."  (Id.)  And, the ALJ found Dr. Wilson's opinion to be inconsistent with that of the consultative examiner, noting Plaintiff told the consultative examiner she was "independent in personal cares and general household management."  (Id.)  The ALJ also placed "appropriate consideration" on the opinions of the "state examiners," without further explanation.

"[G]enerally 'the report of a consulting physician who examined the claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician.'" Thompson v. Bowen, 850 F.2d 346, 349 (8th Cir. 1988) (quoting Hancock v. Secretary of Dept. of Health, Education and Welfare, 603 F.2d 739, 740 (8th Cir. 1979)).  "[A] treating source's opinion regarding the 'nature and severity' of a claimant's condition is entitled to 'controlling weight'

26

if the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).  However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence . . . "  Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (internal citation and quotation marks omitted)).

Plaintiff was hospitalized with severe intrusive thoughts of self harm in 2005. Plaintiff's mother credited Dr. Wilson for a great improvement in Plaintiff's condition after her 2005 hospitalizations.  After 2005, there are no further treatment notes from Dr. Wilson, and very few records at all, until June 2007.  In June 2007, Plaintiff was working part-time, liked her job at Walmart, and said she felt "pretty good."  Plaintiff was still taking Prozac, Seroquel and Ativan, but Dr. Wilson noted her great progress.  In September 2007, Plaintiff's mental status examination was normal, and she reported having "a lot less obsessive thoughts."  However, she quit her job at Walmart, either because she was unhappy that she was not moved out of the cashier position or more likely because she was written up for poor attendance.

Notably, on November 20, 2007, Plaintiff's vocational counselor stated, "[Plaintiff] has applied for Social Security and is not eager to mess up her application by working thereby disproving her application for SSA."  He noted Plaintiff would not be looking for a job while she waited for a decision from the SSA.

In the meantime, Plaintiff underwent her consultative examination with Dr. Scurry, and reported having OCD her whole life, but she had been managing her thoughts much

better since she started Prozac.  She told Dr. Scurry her bad days were fairly rare.  She lived with her parents at the time of the consultative examination but told Dr. Scurry she could do housework, grocery shop,  go out with friends, visit her sister, do crafts and play games.  She needed rides because she did not have a driver's license, which her mother later explained was a conscious decision not to drive because she was taking Ativan, which dulled her senses.

Plaintiff's next appointment with Dr. Wilson was on January 7, 2008, and he noted Plaintiff was denied social security benefits a second time and was discouraged.  Dr. Wilson quoted Plaintiff's statement, "I can function better," which may have simply been her statement why she was denied benefits.  (Tr. 340).  Nonetheless, Dr. Wilson's impression was "I don't see how she can maintain employment because of schizoaffective D complicating multiple learning disabilities (or borderline intellectual function).  Stress of more than part time work in a sheltered setting is likely to result in decompensation."  However, there was little in the progress note to support this statement; Plaintiff was alert and fully oriented, well groomed, cooperative, calm, with a broad range and appropriate affect, normal thoughts but an anxious mood.  The same is true of the remaining progress notes by Dr. Wilson, and Plaintiff's mood improved to "euthymic" on her subsequent visits through October 2009.  Plaintiff simply did not report or exhibit any symptoms to Dr. Wilson in 2007, 2008 or 2009 that would support his disability opinions.  Therefore, his opinions were inconsistent with his own treatment notes, and the ALJ was not required to grant controlling weight to Dr. Wilson's opinions.

The Court looks to the record as a whole to determine if the ALJ's RFC determination was supported by substantial evidence.  The ALJ gave Dr. Scurry's RFC

opinion more weight than Dr. Wilson's, and limited Plaintiff to routine, repetitive instructions and tasks.  The ALJ explained that his RFC determination accommodated Plaintiff's low stress tolerance and nervous preoccupation.  Dr. Scurry found Plaintiff capable of handling stress of "entry-level" work, which is consistent with the fact that Plaintiff worked as a bagger for one year and worked as a cashier for two years.  The ALJ also limited Plaintiff to brief and superficial contact with coworkers and the general public, consistent with Dr. Conroe's opinion.  Although Plaintiff generally got along well with others and was noted to be very good with customers, this limitation is appropriate to accommodate Plaintiff's diagnoses of dependent and histrionic personality traits, which perhaps contributed to her difficulty responding to criticism, as testified to by her mother.

The ALJ discussed Plaintiff's work history and noted there were "other reasons" than mental incapacity that prevented her from working.  Plaintiff's mother testified, and school records support her testimony, that Plaintiff's absenteeism was a life long problem.  Plaintiff's mother struggled to get Plaintiff to understand the consequences of staying home when she did not feel like going to school or work.  Before her 2005 hospitalizations and before she applied for SSI, it was noted that Plaintiff completed cosmetology school, despite the fact that she tended to skip school.

Plaintiff's representative from the administrative hearing asserted in a brief to the Appeals Council that Plaintiff could not hold a job because she stayed home from work if nervous or criticized, and quit if she was on the verge of being fired due to absenteeism.  Plaintiff's ability to hold her job as a bagger for one year and her job as a cashier for two years suggests her borderline intellectual functioning did not preclude her from learning these jobs.  Plaintiff obtained her job as a bagger through a school program, and her school

records indicated that her employer said she was punctual, accurately followed directions, and made an effort to do her best.  In 2007, at the end of her ninety-day training period as a cashier at Walgreens, the record indicates that although Plaintiff had difficulty working a busy cash register, after she was moved to a slower position, her employer was satisfied with her, and Plaintiff was very good with customers.

Plaintiff quit her job at Walgreens, and there is evidence that Plaintiff wanted to look for work in child care or as a CNA.  Plaintiff subsequently volunteered at a hospital.  She lived in her own apartment and was earnestly looking for work in October 2009.  Viewing the record as a whole, there is substantial evidence in the record to support the ALJ's RFC determination that Plaintiff could perform work involving routine, repetitive instructions and tasks, and brief and superficial contacts with coworkers and the public.  The VE testified that such a person could perform Plaintiff's past relevant work as a bagger, and the ALJ relied on this testimony.  See Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) (where hypothetical question posed to the VE contained all of the concrete consequences of the claimant's impairments, ALJ was entitled to rely on VE's testimony).  This Court recommends affirming the ALJ's decision.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.   Plaintiff's Motion for Summary Judgment (Doc. No. 10) **be DENIED**;

2.   Defendant's Motion for Summary Judgment (Doc. No. 12 ) **be GRANTED**;

3.   The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**

DATED: February 1, 2012

s/ Franklin L. Noel_____
FRANKLIN L. NOEL
United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before_February 15, 2012, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.